728 F.2d 285
 EATON CORPORATION, an Ohio corporation,
Plaintiff/Counter-Defendant-Appellee,
v.
EASTON ASSOCIATES, INC., a Michigan corporation,
Defendant/Counter-Plaintiff,
Eugene SLOAN, Defendant/Counter-Plaintiff-Appellant,
v.
MANUFACTURERS HANOVER MORTGAGE CORPORATION, Additional
Counter-Claim Defendant-Appellee.
 Nos. 82-1253, 82-1519.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 6, 1983.
Decided Feb. 20, 1984.
 
 Herschel P. Fink, argued, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., Albert L. Lieberman, Southfield, Mich., for Sloan.
 Wilfred A. Steiner, Jr., Jeff Lipshaw, argued, Detroit, Mich., Gordon A. Becker, argued, Birmingham, Mich., for Eaton Corp. and Mfrs. Hanover.
 Before MERRITT and KENNEDY, Circuit Judges, and BERTELSMAN, District Judge.*
 CORNELIA G. KENNEDY, Circuit Judge.
 
 
 1
 Eugene Sloan appeals a summary judgment dismissing his counterclaim for damages and specific performance for Eaton's alleged default on an option agreement to purchase real property. Sloan also appeals a similar judgment of a fraud claim against Eaton arising out of the same transaction. We affirm the District Court's summary judgment for appellee Eaton Corporation denying Sloan's contract claim. With respect to Sloan's fraud claim we affirm in part, and reverse in part, and remand for further proceedings.
 
 I.
 
 2
 Appellee Eaton Corporation (Eaton) had acquired the Five-acre parcel of property in Farmington Hills, Michigan at issue in this action from Jack Peltz and Jerome Kornheiser, who are not parties in this action. Under the sales contract between Eaton, and Peltz and Kornheiser the latter parties retained a right to repurchase the property from Eaton in the event that Eaton had not effected "substantial construction" on the property within two years of the sale.[1] Eaton informed Peltz and Kornheiser on March 12, 1979 of its intention to try to sell the property, and told Peltz and Kornheiser that they must exercise their repurchase right by March 30, 1979, or waive it. Eaton had not begun any construction at this time. Peltz and Kornheiser notified Eaton on March 21, 1979 that they disagreed with Eaton's interpretation of their repurchase right under the contract and maintained that although they declined to repurchase at that time they continued to have a right to do so until the expiration of the two-year period. Doan wrote back on March 26, 1979 disagreeing with Peltz' and Kornheiser's interpretation of the repurchase right, and reiterating that Eaton would sell the property to a third party unless Peltz and Kornheiser exercised their right to repurchase by March 30, 1979.
 
 
 3
 Appellant Sloan entered into an option agreement with Eaton on August 13, 1979 for purchase by Sloan of the five acres. At the time of this agreement Sloan deposited $10,000 into escrow with Easton Associates (Easton) as consideration for the option. The agreement required that Sloan exercise his option within 150 days of its execution. Under paragraph 2.3(b) of the agreement Sloan was required to tender $30,000 within the 150-day period of the agreement in order to exercise the option:
 
 
 4
 At the time of exercise of the Option, Seller shall deliver to Escrow Agent a deposit of Thirty Thousand Dollars ($30,000.00) (the "Deposit"), to be applied against the purchase price and Escrow Agent shall deliver a portion of the Option Payment to Seller and a portion of the Option Payment to Purchaser as indicated in the schedule set forth in Section 2.3(c) below. Should Purchaser exercise the Option at any time after 120 days from the date hereof, the entire Option Payment shall be paid to Seller.
 
 
 5
 Under paragraph 2.2(b) of the agreement, Eaton agreed to provide Sloan with copies of all agreements in its possession relating to the subject property within three days of the execution of the option agreement, and Sloan had the right to terminate the agreement if he found any such agreement unsatisfactory:
 
 
 6
 Within three (3) days of the date hereof, Seller shall deliver to Purchaser copies of all easements, surveys engineering plans for utilities, paving, etc., and all agreements whatsoever in Seller's possession, relating to the Property. If Purchaser determines, in his sole discretion, that any of the foregoing items are unsatisfactory to him and gives Seller notice thereof within five (5) days after receipt of all such items, Escrow Agent shall return the entire Option Payment to Purchaser, in full and complete termination of this Agreement.
 
 
 7
 There is some dispute as to what occurred thereafter but in many respects there is agreement. Where there is disagreement, those facts most favorable to Sloan will be assumed to be true.
 
 
 8
 Eaton had sent Sloan's attorney, Jeffrey Kott, a copy of the Peltz and Kornheiser-Eaton sales contract containing the Peltz and Kornheiser repurchase clause on July 26, 1979 and Kott sent a copy to Sloan on August 15, 1979. Under paragraph 2.2(b) of the agreement Sloan had a right to rescind the transaction within five days of receipt of the copy of the Peltz and Kornheiser agreement, but he did not do so. Instead Mr. Kott phoned Eaton's attorney, James Doan, on August 16, 1979, regarding the repurchase provision. Kott said that Doan told him that there was "no problem." In a letter dated the same day Kott wrote Doan that he understood that "Eaton Corporation will make arrangements to eliminate this apparent inconsistency prior to closing of the sale pursuant to the Option Agreement." On August 24, 1979, Doan wrote Kott and enclosed a copy of Doan's March 12 letter to Peltz and Kornheiser giving them until March 30 to exercise their repurchase option. In his letter Doan stated:
 
 
 9
 The reason I hesitated to send these along at all is because they do not completely reflect the status of this matter. I later had two phone conversations with [Peltz and Kornheiser's attorney]. In one we agreed not to debate the issues, but I informed him I needed to know what their intentions were. [In the other he stated that] his clients did not think that the price ... was fair, and that they wouldn't pay that much.
 
 
 10
 Doan closed his letter saying "Suffice it to say that the title report will be clean, and our representations and warranties should cover your client under any circumstances."
 
 
 11
 Kott replied to Doan in a letter of September 5, 1979:
 
 
 12
 Please be advised that we are proceeding with the Option Agreement based upon your assurances that Eaton Corporation will resolve the apparent problem with the prior owners of the property, that seller's representations and warranties contained in the Option Agreement will adequately protect the purchaser and that the title policy to be issued to purchaser at the closing will be "clean". In connection with the development of the property, our client is proceeding toward obtaining a building permit and site plan approval, and has engaged architects, engineers, etc.
 
 
 13
 In his deposition Kott also stated that Doan made additional oral representations to him, assuring him that there was or would be no problem with title.
 
 
 14
 Under paragraph 4.1 of the option agreement Eaton was to provide Sloan with an owner's title insurance commitment within 15 days of the option agreement which was to guarantee title to the property to be in "good and marketable condition." On August 30, 1979 Eaton provided Sloan with a title insurance commitment effective August 16, 1979. The policy provided:
 
 
 15
 This commitment is delivered and accepted upon the understanding that the party to be insured has no personal knowledge or intimation of any defect, objection, lien or encumbrance affecting subject land other than those set forth herein....
 
 
 16
 The Peltz and Kornheiser repurchase option was not referred to in the insurance commitment. Sloan had constructive, if not actual, knowledge of this problem with the title through his attorney Kott. Consequently, the insurance commitment did not cover this deficiency and the commitment did not therefore guarantee title to be in good and marketable condition. The parties are in agreement on this point.
 
 
 17
 The parties had contracted in anticipation of such a situation. The option contract provided, at paragraph 4.2:
 
 
 18
 If objection is made by written notice from Purchaser to Seller that title is not in the condition required within fifteen (15) days after receipt of such commitment by Purchaser, Seller shall have twenty (20) days from the time it is notified in writing of the particular defects claimed to remedy the title or to obtain endorsements to the title insurance commitment which guarantee that Lawyers Title shall insure against such defects. If Seller is unable to remedy the title or obtain the endorsements within said twenty (20) day period, Purchaser shall have the option to proceed with this Agreement (in which event, the warranty deed to the property will be delivered subject to any such title defects) or to cancel this Option Agreement and receive back from Seller the Option Payment. Notwithstanding the foregoing, should any liens or encumbrances upon the Property appear which arose because of any action or failure to act on the part of Seller, then Purchaser shall have the right to apply that portion of the purchase price as may be required to discharge any such liens and/or encumbrances and to deduct the amount thereof from the purchase price, or to take title subject to such defects (emphasis added).
 
 
 19
 Sloan chose not to exercise his right to cancel the option contract after receiving the insurance commitment which did not insure against the Peltz and Kornheiser claim. Sloan instead went ahead to make arrangements for construction which he planned for the land. He hired engineers and architects and sought approval from the City of Farmington Hills to build an office building. Sloan states that his expenses for these purposes came to more than $50,000.
 
 
 20
 On January 9, 1980 Sloan deposited an additional $2,500 into escrow with Easton in order to extend the period of the option agreement for 30 days.[2] Then at a meeting on January 21, 1980 Eaton informed Sloan that Eaton could not and would not take any action to eliminate Peltz' and Kornheiser's repurchase rights and clear title. On January 30, 1980 Eaton in a written agreement extended the option period to February 25, 1980. In a second writing, dated February 25, 1980, Eaton extended Sloan's option to March 5, 1980.
 
 
 21
 On March 5, 1980, the last day of the option period, Sloan gave Eaton a letter stating that Eaton was in breach of the option agreement. Sloan demanded that Eaton remedy the defect in title, and advised Eaton that Sloan considered that the option would remain in effect until the defect was cured. Sloan did not tender the $30,000 required by paragraph 2.3(b) of the option agreement to exercise the option. Sloan also instructed Easton not to release the $12,500 in escrow to Eaton.
 
 
 22
 Eaton filed this diversity action against Sloan and Eaton to recover the $12,500 which Sloan had deposited with Easton. Eaton claimed that Sloan had forfeited this amount by failing to exercise the option. Sloan counterclaimed, seeking specific performance of the option agreement. Sloan sought damages of $500,000 he claimed as a result of not purchasing the property, and $1 million in exemplary damages for alleged fraud and misrepresentation. Eaton counterclaimed for its lost commission of $30,000.
 
 
 23
 On December 26, 1980 Eaton sold the five acre parcel of property to Manufacturers Hanover Mortgage Corporation (MHMC). MHMC took title with full knowledge of the Peltz and Kornheiser repurchase right. MHMC was shortly thereafter joined in the action as a counterclaim defendant.
 
 
 24
 Shortly before trial Eaton filed a motion for summary judgment on all claims asserted in the action. The District Court entered its opinion and order on March 12, 1982 granting Eaton's motion for summary judgment in all respects. Sloan timely filed this appeal on his contract and fraud claims.
 
 
 25
 After the appeal was filed MHMC filed a motion in the District Court requesting that it cancel any lien which Sloan may have since he did not file a bond. The District Court denied the motion but did enter an order requiring Sloan to reimburse MHMC for real estate taxes and assessments paid during the pendency of the action in the event that Sloan prevailed. The order was entered on July 9, 1982, while this appeal was pending. Sloan, in addition to his contract and fraud claims, now challenges the District Court's jurisdiction to enter this order while the appeal was pending before this Court.
 
 II.
 
 26
 Sloan argues that Eaton had breached the option agreement and that Sloan is consequently entitled to sue on the option contract for damages and specific performance. We agree with the District Court that Sloan is entitled to neither remedy because 1) Eaton was not in material breach of the option contract; and 2) Sloan never exercised the option.
 
 
 27
 There are no disputed questions of material fact with respect to these issues. Sloan argues that Eaton breached the agreement by its failure to deliver to him a title insurance commitment guaranteeing "good and marketable condition," as required by paragraph 4.1 of the agreement. Both parties agree that Eaton did fail to provide such a policy. But the option agreement provided a remedy: the parties contracted for this contingency in paragraph 4.2 of the agreement. Sloan was entitled to give written notice to Eaton within 15 days of receipt of the commitment that the title was not in the required condition. Eaton would then have had 20 days to remedy the defect. When Eaton failed to do so Sloan then had a choice of cancelling the option and getting his option payment back, or going ahead with the agreement, in which case the title would be delivered subject to the defect. Sloan would then have had a right to apply as much of the purchase price as necessary to cure the defect. Sloan chose not to cancel the agreement, and Eaton was consequently authorized to deliver title with the defect. Consequently, even an avowal by Eaton that it did not have marketable title and would not be able to deliver marketable title at closing, did not constitute a breach.
 
 
 28
 Moreover, Sloan never acquired any right to the property because he did not exercise the option by its expiration date. The Michigan Supreme Court has consistently held throughout this century that an optionee must exercise his option in order to have rights under the underlying contract. In Muirhead v. Friemann, 270 Mich. 181, 258 N.W. 238 (1935), the plaintiff sued for specific performance of an option contract to buy land. The plaintiff, like Sloan, had not tendered the price called for under the option contract by the closing date of the option. The court denied specific performance, stating:
 
 
 29
 To entitle the plaintiff to specific performance, the burden was cast upon him to show that he has complied with its terms. To do so he was required to pay to the defendants on or before June 5, 1933, the sum of $13,000....
 
 
 30
 Id. at 185, 258 N.W. 238. See also Gurunian v. Grossman, 331 Mich. 412, 49 N.W.2d 354 (1951); Mathieu v. Wubbe, 330 Mich. 408, 47 N.W.2d 670 (1951); LeBaron Homes, Inc. v. Pontiac Housing Fund, Inc., 319 Mich. 310, 29 N.W.2d 704 (1947); Thomas v. Ledger, 274 Mich. 16, 263 N.W. 783 (1935); Tromley v. Lange, 236 Mich. 240, 210 N.W. 202 (1926); Cameron v. Shumway, 149 Mich. 634, 113 N.W. 287 (1907); Gustin v. Union School District, 94 Mich. 502, 54 N.W. 156 (1893).
 
 
 31
 Sloan relies heavily on Hanesworth v. Hendrickson, 320 Mich. 577, 31 N.W.2d 726 (1948). In that case plaintiff contracted to purchase a piece of land from defendant, but before the closing date defendant informed plaintiff that he would not deliver the property. Plaintiff did not tender payment, but successfully sued for specific performance. Hanesworth presents a classic case of anticipatory breach of a land sale contract. In the case of anticipatory breach of a contract of sale plaintiff is not required to tender performance in order to bring suit on the contract. 4 Corbin on Contracts Sec. 959 (1979). Sloan did not have a land sale contract. He had only an option to buy land, and an optionee must exercise his option to have rights under the underlying contract. Aside from Hanesworth, the only Michigan case cited by Sloan on this point is O'Toole & Nedeau Co. v. Boelkins, 254 Mich. 44, 235 N.W. 820 (1931). In that case plaintiff had an option to buy land from defendants, and on the last day of the option period plaintiff's officers went to defendants' home, where defendants had said they would be, to tender payment. Plaintiff's officers had with them $15,000 of the $6,000 purchase price in cash and the balance in certificates of deposit. Plaintiff's officers waited for two hours for defendants to appear, which they did not, and then left. Plaintiff sued defendants for damages. Defendants argued that plaintiff had not tendered legal tender, but the court rejected this argument as specious and awarded damages to plaintiff. This case is clearly not apposite to Sloan's situation, since it involves a purchaser who was ready and willing to tender payment and indeed did so, and a vendor who was evading the purchaser in order to avoid his obligations under the option agreement. Sloan on the other hand never made any effort to tender the $30,000 while Eaton remained willing to tender the land.
 
 
 32
 Accordingly, we affirm the judgment of the District Court that Sloan was not entitled to damages or specific performance under the option contract.
 
 III.
 
 33
 Sloan also argues that he is entitled to damages on a fraud theory. He claims that Eaton is liable to him for his expenditures made in anticipation of construction on the property--i.e., obtaining a building permit and site plan approval, engaging architects and engineers--and for exemplary damages.
 
 
 34
 The District Court ruled that in order for Sloan to have a claim for fraud he would have had to have exercised the option. It reasoned that in order for Sloan to have been defrauded he would have had to have been wrongfully deprived of his rights under the option contract, and that until Sloan exercised the option he had no rights against Eaton except a right to bind Eaton for a limited period of time. Consequently, the District Court said, whatever assurances Eaton may have made to Sloan could not have been the legal cause of Sloan's damages.
 
 
 35
 We disagree. First, while we agree that while Sloan had no right to the property under the option contract, he did have a right under par. 2.2 of the option contract to cancel the contract and receive his $10,000 consideration back within five days after learning of the title defect. We find that there is a question of fact as to whether Eaton, intending to induce Sloan to give up this right upon which Sloan relied,[3] did make material misrepresentations. If so, Sloan may be entitled to a refund of his $10,000 consideration, which the District Court awarded to Eaton. If Eaton fraudulently induced Sloan to extend the option period, then Sloan may also be entitled to receive back his additional $2,500 of consideration for the option. These are questions of fact, and consequently summary judgment on this question was not appropriate.
 
 
 36
 Secondly, while the absence of a right to the property itself does preclude Sloan's suit on the contract here, we do not believe that it precludes a fraud claim for damages for Sloan's expenditures. Michigan law governs in this diversity action. To sustain an action for common law fraud under Michigan law it must appear that 1) there was a material representation by defendant that was false; 2) the defendant knew that it was false when he made it or made it recklessly without any knowledge of its truth and as a positive assertion; 3) the defendant made it with the intention that it should be acted upon by plaintiff; 4) plaintiff acted upon it and 5) thereby suffered injury for which he sues. United States v. Cripps, 460 F.Supp. 969, 975 (E.D.Mich.1978); Michael v. Jones, 333 Mich. 476, 479, 53 N.W.2d 342 (1952); McIntyre v. Lyon, 325 Mich. 167, 170, 37 N.W.2d 903 (1949); 12 Michigan Law and Practice, Frauds Sec. 1, at 390. Under Michigan law "[f]raud is an intentional perversion or concealment of the truth for the purpose of inducing another in reliance upon it to part with some valuable thing or to surrender a legal right." Barkau v. Ruggirello (on rehearing), 113 Mich.App. 642, 647, 318 N.W.2d 521 (1982); Johnston's Administrator v. United Airlines, 23 Mich.App. 279, 285, 178 N.W.2d 536 (1970).
 
 
 37
 We believe that Sloan's case fits under the rubric of fraud in Michigan law. The money which Sloan expended in preparing to build on the property was a "valuable thing." If Eaton made false representations on which Sloan justifiably relied, with Eaton knowing of their falsity and intending Sloan to rely upon them and make the expenditures, then Sloan may maintain a fraud action. These are questions of fact which must be resolved.
 
 
 38
 The Michigan case law of fraud often presents one of two fact patterns. In the first pattern the parties in the action are a plaintiff-purchaser and a defendant-seller. Generally, the plaintiff alleges that the defendant misrepresented the value of a good or service, and the plaintiff, upon purchase, discovers that the product is worth less than the represented value. Hyma v. Lee, 338 Mich. 31, 60 N.W.2d 920 (1953); Mesh v. Citrin, 299 Mich. 527, 300 N.W. 870 (1941); Kawsny v. Driessen, 42 Mich.App. 442, 202 N.W.2d 443 (1972). In the second typical fact pattern a plaintiff-purchaser sues a defendant, who was not a party to the sale transaction, for having made false representations which induced the buyer to purchase from a non-party seller, and the plaintiff got less than he bargained for from the seller. Wettlaufer Manufacturing Corp. v. Detroit Bank, 324 Mich. 684, 37 N.W.2d 674 (1949); Steele v. Banningna, 225 Mich. 547, 196 N.W. 404 (1923); Aldrich v. Scribner, 154 Mich. 23, 117 N.W. 581 (1908). Here we have neither of those situations. However, the second fact pattern illustrates that the tort of fraudulent misrepresentation may be established where the plaintiff has no contractual rights against defendant. We have been directed to no Michigan case and are unable to find any in which the liability of the maker of a fraudulent misrepresentation has been extended to one in Eaton's position. We must therefore determine what Michigan courts would hold under these circumstances.
 
 
 39
 We believe that the situation in this case is covered by the misrepresentation provisions of the Restatement (Second) of Torts. Section 531 sets out the general rule for an action of misrepresentation:
 
 
 40
 One who makes a fraudulent misrepresentation is subject to liability to the person or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.
 
 
 41
 Section 548A determines whether damages are legally caused by the misrepresentation. That section provides:
 
 
 42
 A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance.
 
 
 43
 Section 549 sets out the measure of damages, providing in relevant part:
 
 
 44
 (1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including
 
 
 45
 (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
 
 
 46
 (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.
 
 
 47
 The comment to clause (1)(b) states that such a recoverable financial loss "may be the expense to which [the plaintiff] has gone in preparation for a use of the article for which it would have been appropriate if the representation had been true." (emphasis added) The Restatement thus would permit for recovery of damages such as Sloan's expenditures.
 
 
 48
 The Michigan courts have recognized that there may be liability where the parties have a contractual relationship and one makes a separate representation of fact in a matter not directly part of that contractual relationship. In Howard v. Reaume, 310 Mich. 119, 16 N.W.2d 686 (1944), defendants sold certain furniture in a rooming house to plaintiffs. A relative of defendants owned the rooming house and leased it to plaintiffs. Trouble arose between the landlord and plaintiffs when plaintiffs deducted the cost of certain repairs from the monthly rental. The landlord began an eviction action. Plaintiffs did not pay the past due rent or appeal the eviction action and were evicted. They sued defendants claiming that defendant Delia Reaume, acting as agent for the other defendant as well as the landlord, promised not to evict plaintiffs while settlement negotiations were pending and that she had made this promise in bad faith without intention of performance. Plaintiffs claimed they had arranged for the sale of the furniture and the rooming house business but before they could complete the sale, they were evicted. The court recognized that a promise made in bad faith without intention to perform could be misrepresentation but found no evidence from which it could reasonably be inferred that the promise was made without intention of performance. The mere non-performance of the promise was held not to be evidence of fraud. See also Hi-Way Motor Company v. International Harvester Company, 398 Mich. 330, 247 N.W.2d 813 (1976).
 
 
 49
 Courts have long held that a defendant who is not in privity of contract with a plaintiff is liable for fraud if the defendant's misrepresentation caused the plaintiff to act or forbear from action, the plaintiff thereby suffered loss, and the defendant benefited therefrom. The Supreme Court so held in Butler v. Watkins, 80 U.S. 456, 20 L.Ed. 629 (13 Wall. 1872). In Butler the defendant corporation induced plaintiff to believe that it would enter into a contract to market plaintiff's patented bailing device. The defendant delayed the contract formation by fraudulently stating that certain papers required approval from England, and no contract was ultimately formed. As a result of the delay caused by the misrepresentation plaintiff's product did not come onto the market during the cotton season. The defendant, meanwhile, sold a similar product during the cotton season, without competition from plaintiff. The court allowed the plaintiff to maintain an action for fraud applying federal common law.
 
 
 50
 Sloan alleges that Eaton's misrepresentations caused him to make expenditures, but, unlike the facts in Butler, Sloan does not allege that Eaton reaped any gain by virtue of his loss. Michigan law distinguishes between cases in which the tortfeasor in a fraud action benefits from his deception, and those in which the tortfeasor does not. If Eaton has made false representations, we assume that it falls into the latter category of tortfeasors. The Michigan Supreme Court articulated the distinction in Rosenberg v. Cyrowski, 227 Mich. 508, 511-12, 198 N.W. 905 (1924):
 
 
 51
 When action is brought to recover for false and fraudulent representations made by one party to another in a transaction between them, any representations which are false in fact and actually deceive the other and are relied on by him to his damage are actionable, irrespective of whether the person knew them to be false or acted in good faith in making them, when the loss of the party deceived inured to the benefit of the other. (citations omitted)
 
 
 52
 But when the person making the representations is not a party to the transaction and in no way profits by the act of the party defrauded in reliance on the representations made by him, he is liable for damage only in case he knows the representations made by him to be false, and makes them for the purpose of deception and with the intent that they shall be relied on and acted on by the person to whom they are made and loss or damage results therefrom. Aldrich v. Scribner [154 Mich. 23, 117 N.W. 581 (1908) ]; Steele v. Banninga, 225 Mich. 547, 196 N.W. 404 [1923].[4]
 
 
 53
 Thus in order to prevail under Michigan law Sloan must show that Eaton intended that Sloan rely and act upon any misrepresentations that Eaton may have made.[5]
 
 
 54
 We find that Sloan, upon the facts alleged, may bring an action of fraud against Eaton. There are a number of factual issues in dispute. Consequently, we reverse the District Court's grant of summary judgment for Eaton on Sloan's fraud claim.
 
 
 55
 Accordingly, the judgment of the District Court is affirmed in part and reversed in part.
 
 
 
 *
 Honorable William O. Bertelsman, United States District Court for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 Paragraph 16(c) of that agreement provided:
 Buyer agrees that within two years from the date of this Agreement, Buyer will commence construction on the Premises. Should there be no evidence of substantial construction by Buyer within said Period, Seller shall have the option to purchase the Premises from the Buyer for the amount of the Purchase Price, plus ten percent (10%) of the Purchase Price per annum, plus the reasonable costs of Buyer incurred for the re-sale to Seller. Sellers [sic] option under the conditions set forth in this paragraph 16 c shall survive the two year period, but shall terminate upon commencement of substantial construction thereafter.
 
 
 [2]
 This procedure was provided for under paragraph 2.3(a) of the option agreement:
 The Option shall be exercised, if at all, on or before one hundred fifty (150) days from the date thereof, by notice from Purchaser to Seller; provided, however, Purchaser may extend the date by which Purchaser must exercise the Option an additional thirty (30) days by delivering Twenty Five Hundred ($2,500.00) Dollars to Escrow Agent prior to the expiration of said one hundred fifty (150) days, which sum shall be added to and become a part of the Option Payment.
 
 
 [3]
 See Berry et al. v. Chrysler Corp., 150 F.2d 1002 (6th Cir.1945) (applying Michigan law). Plaintiff-appellant had entered into a contract to sell automobiles manufactured by Chrysler in 1934. The contract provided that either party could terminate with or without cause on 15 days notice. There was no other provision in the contract regarding its duration, but Chrysler assured appellants that the relationship would continue for five or ten years. The contract was re-executed from time to time, the last time being March 26, 1937. Appellants declined to exercise their right to terminate the contract each time because of Chrysler's assurances. Based on these assurances, appellants expended substantial amounts of money in building up their auto sales business, particularly in 1937. Chrysler gave notice of termination on September 8, 1937. The court found that the facts as stated did present a fraud claim, but that the claim was barred by the statute of limitations
 
 
 [4]
 Cf. I Harper and James, The Law of Torts Sec. 7.2, at 531 (1956):
 It is to be noted that it is not necessary that the person making the misrepresentations intend to cause loss to another or gain to himself; it is only necessary that he intend action in reliance on the truth of his misrepresentation.
 
 
 [5]
 Comment (c) of the Restatement (Second) Torts Sec. 531, defines intent for purposes of actions for misrepresentation as follows:
 A result is intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct. * * * Thus one who believes that another is substantially certain to act in a particular manner as a result of a misrepresentation intends that result, although he does not act for the purpose of causing it and does not desire to do so.